1  **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                      FOR THE DISTRICT OF ARIZONA

8

9  Elizabeth Valenzuela,                    )    No. CV 08-228-PHX-NVW
                                            )
10              Plaintiff,                   )    **ORDER**
                                            )
11 vs.                                       )
                                            )
12                                           )
   Michael J. Astrue, Commissioner of Social )
13 Security,                                 )
                                            )
14              Defendant.                   )
                                            )
15 _____ )

16

17         Elizabeth Valenzuela ("Ms. Valenzuela") filed suit to challenge the denial of disability

18 benefits by the Commissioner of Social Security ("the Commissioner").  (Doc. # 1.)  Ms.

19 Valenzuela now moves for summary judgment.  (Doc. # 27.)  Jurisdiction is proper under

20 § 205(g) of the Social Security Act, 42 U.S.C. § 405(g).  Because the decision of the

21 Administrative Law Judge ("ALJ") is supported by substantial evidence and is not based on

22 legal error, Valenzuela's motion will be denied.

23     **I.  Factual Background**

24         **A.  Initial Treatment**

25         Between 1991 and 2003, Ms. Valenzuela worked in a number of different jobs

26 over a period of ten to twelve years. Those jobs included being a phone operator, a

27 cashier, a daycare assistant and cook, a dietary aid, and a patient transporter. [TR 105.]

28 She left the workforce in 2003 and began seeking treatment for pain that she was

experiencing. [TR 299.] On August 22, 2003, she was diagnosed with lumbrosacral pain and morbid obesity, and began taking analgesics.  [TR 293.]  At that time, she was advised to lose weight.  [TR 293.] Returning for treatment, she was tearful and complained that the pain was getting worse, preventing her from exercising and losing weight. [TR 290, 292.] On further complaints in December, Ms. Valenzuela received an MRI of the lumbar spine which revealed mild degenerative disc disease. [TR 289, 255.] The medical professionals treating Ms. Valenzuela to this point expressed no opinion regarding her ability to work that appears in the record.

Eleven months passed.  In November 2004, Ms. Valenzuela obtained further treatment from Dr. William Pretlow.  She was crying during the examination.  The doctor identified several tender points and diagnosed lumbar radiculopathy with fibromyalgia. He prescribed Tylenol. [TR 250.] Dr. Pretlow continued treatment in the following weeks, prescribing Oxycodone and Zoloft, and administering trigger point injections. [TR 247-49.]

Shortly thereafter, Ms. Valenzuela began pursuing disability benefits.  In January 2005, Dr. Pretlow wrote on two separate prescription slips that Ms. Valenzuela was disabled.  [237, 238.]  On one of them, he noted that she was unable to engage in all types of work for twelve months. He included no medical analysis or standard with this conclusion.  The other slip noted that her condition might improve.  Ms. Valenzuela applied for a period of disability and disability insurance benefits on February 23, 2005, alleging that she had been disabled starting on May 28, 2003. [TR 64.]

The symptoms continued.  A muscle strain brought Ms. Valenzuela to the emergency room in April 2005.  At that time, she reported a history of fibromyalgia, migraines, and insomnia. [TR 267-68.]   Dr. Pretlow saw her in July and August 2005 [TR 241, 243], and she began a course of chiropractic therapy with Herb Schillerstrom. The chiropractic sessions proceeded every few days for several months.  Throughout these sessions, the chiropractor noted that the patient's condition was improving with

1     each treatment.  On a scale of 1 to 10, the pain was reduced from level 8 to level 4 or 5.

2     [TR 138-196.]

3                  **B.**     **Examining Physicians**

4         At this point, two examining physicians saw Ms. Valenzuela at the request of the

5     commissioner.  The first was Dr. Shannon Tromp, who performed a mental status

6     examination on September 29, 2005.  [TR 262-65.] Ms. Valenzuela reported that she

7     spent most days in bed watching television, though she did some light housework, and

8     that she had to sit down after standing for a period of time.  Ms. Valenzuela added that

9     prolonged sitting also forced her to stand, which interfered with her scrapbooking hobby.

10     Ms. Valenzuela reported that although she was happy most of the time, and had many

11     things in her life that made her happy, she occasionally would break down in tears and

12     felt frustrated by her limitations.  Dr. Tromp diagnosed depressive disorder (NOS, mild,

13     secondary to pain and physical limitation). She asserted that Ms. Valenzuela's condition

14     placed a moderate limitation on her ability to carry out detailed instructions to focus for

15     extended periods, and to respond to changes in work setting. [TR 258, 260.] Otherwise,

16     Dr. Tromp stated that Ms. Valenzuela had no significant impairment in her

17     comprehension, memory, social interaction, or adaptation. In conclusion, she stated that

18     Ms. Valenzuela could perform simple and repetitive tasks. [TR 258, 265.]  Another

19     physician, Dr. Galluci, reviewed Dr. Tromp's assessment and agreed that Ms. Valenzuela

20     could perform simple work. [197-210, 225, 227.]

21         Board-certified specialist in medicine and rehabilitation Dr. Malcolm McPhee

22     examined Ms. Valenzuela on October 17, 2005. [TR 132-33.] Dr. McPhee noted several

23     tender areas, along with normal muscle strength in all four limbs and normal ranges of

24     motion. He diagnosed migraine headaches, depression, and fibromyalgia.  Dr. McPhee

25     also noted that Ms. Valenzuela tended to "grimace and groan and grunt out of proportion

26     of the gentle nature of the examination." [TR 132.] He concluded that she could lift 50

27     pounds occasionally, 25 pounds frequently, stand or walk at least two hours in an eight-

28     hour workday, and sit without restriction.  [TR 132-33, 135-37.] He opined that these

1  abilities would enable her to perform medium work, and a state agency physician

2  generally concurred in his report. [TR 133, 122-29.]

3                          **C.    Continued Treatment**

4          Four days after the October visit with Dr. McPhee, Ms. Valenzuela returned to Dr.

5  Pretlow for further treatment. [TR 240.] The doctor noted that she hobbled into the room.

6  Lortab and Soma were prescribed.

7          The following month, Ms. Valenzuela went to the emergency room for treatment

8  of a migraine headache.  She received medication that alleviated the pain. [TR 229-35.]

9          Dr. Pretlow prescribed additional medication for Ms. Valenzuela in January,

10  February, March, and April 2006. In his report on the final visit, Dr. Pretlow stated that

11  he had exhausted treatment options for Ms. Valenzuela's migraines, fibromyalgia, and

12  panic attacks. [TR 282.] In the course of these visits, he arranged for Ms. Valenzuela to

13  receive treatment from two rheumatologists.

14          The first was Dr. Nardella, who saw Ms. Valenzuela on March 6, 2006.  [TR 270-

15  72.] Dr. Nardella confirmed the diagnosis of fibromyalgia, prescribing continued

16  medication and chiropractic care, additional testing, and a follow-up visit in three weeks

17  or so.  The second was Dr. Stuart Posner, whom Ms. Valenzuela visited on July 28, 2006.

18  [TR 283-84.] Dr. Posner noted that Ms. Valenzuela displayed "hyper sensitivity to even

19  the gentlest of palpation." He affirmed the previous diagnosis of fibromyalgia and

20  doubted that further effective therapy was available.  Questions about Ms. Valenzuela's

21  motivations intensified those doubts.  "[S]ignificant secondary motivation to be regarded

22  as medically disabled may interfere with a productive effort at recovery."

23          Dr. Posner performed follow-up examinations in September 2006, October 2006,

24  and January 2007.  He noted knee pain and some resistence to hip rotation.  He

25  maintained that Ms. Valenzuela suffered from fibromyalgia with associated reactive

26  depression.  The course of medication was continued. [TR 285-86.]

27

28

1

### D.   Administrative Proceedings

2       As noted above, Ms. Valenzuela had applied for a period of disability and

3  disability insurance benefits on February 23, 2005, alleging that she had been disabled

4  starting on May 28, 2003. [TR 64.] A hearing was conducted on January 18, 2007.

5  [TR 297-335.]   She testified that she had gained 40-60 pounds over the past three years

6  and that she had debilitating headaches and other pain that she managed with medication.

7  [TR 304-10.]  She also stated that she could not take care of herself but managed certain

8  household chores like dusting, washing dishes, and cooking simple meals.  At some point,

9  she had tried to conceive a child, and she expressed confidence that her mother and sisters

10 could help her with child rearing. [TR 313-15.] She rated her average pain as eight on a

11 scale of one to ten. [TR 309.]

12      At the hearing, a vocational expert testified that prior to leaving the workforce, Ms.

13 Valenzuela had been performing work in classifications ranging from light unskilled

14 (cashier) to medium semi-skilled (patient transporter).  [TR 321.]  The expert opined that

15 an individual of Ms. Valenzuela's age and education who was limited to simple and

16 repetitive work with a sit/stand option could perform in a substantial subset of cashier's

17 positions, but not as a dietary aid.  The expert noted that 20% of cashier's jobs could be

18 performed with such limitations, and that there were 4,000 such jobs in Arizona.  [TR

19 322-24.]

20      The ALJ denied benefits on the grounds that Ms. Valenzuela remained capable of

21 performing simple and repetitive work with a sit/stand option. [TR 30-36.]  She

22 considered the physicians' various opinions, and noted that the medical records accorded

23 with this outcome.  The semi-monthly migraine headaches were responsive to medication.

24 Two physicians' reports suggested that Ms. Valenzuela was prone to exaggerate, and the

25 ALJ noted certain inconsistencies in her testimony.  The other treating physician, Dr.

26 Pretlow, made conclusory statements that Ms. Valenzuela was disabled without any

27 supporting medical rationale, aside from the basic diagnosis which does not vary from

28 doctor to doctor.

1    After the hearing, benefits were denied, and Ms. Valenzuela exhausted her

2 administrative appeal.

3       **II.    Standard of Review**

4    "The ALJ's decision denying the disability insurance benefits will be disturbed

5 only if that decision is not supported by substantial evidence or it is based upon legal

6 error." *Tidwell v. Apfel,* 161 F.3d 599, 601 (9th Cir. 1998)*.*

7       **III.    Analysis**

8    To determine whether a claimant is disabled for purposes of the Social Security

9 Act, the ALJ follows a five-step process. 20 C.F.R. 404.1520(a). In this case, the ALJ

10 denied benefits under step four of the process, which requires the ALJ to determine

11 whether a claimant can perform his or her past relevant work. *See* 20 C.F.R. §§

12 404.1520(e), 416.920(e). Step four requires the ALJ to review a claimant's residual

13 functional capacity and the physical and mental demands of the work he or she has

14 previously performed. *See id.* If the ALJ determines the claimant has the residual

15 functional capacity required to perform this past work, the claimant is found not disabled.

16    In this case, the ALJ's findings were not legally erroneous and were supported by

17 substantial evidence: to wit, the reports of the treating and examining physicians coupled

18 with Ms. Valenzuela's credibility problems.

19       **A.  The Medical Evidence**

20    The two examining physicians in this case agreed that Ms. Valenzuela could

21 function in the workplace. Dr. Tromp, the psychologist, diagnosed some depression and

22 cognitive limitations. Nonetheless, she concluded that these conditions were not

23 significant impairments. In Dr. Tromp's opinion, Ms. Valenzuela remained mentally

24 capable of simple work. Likewise, Dr. McPhee's examination revealed mostly normal

25 objective findings. He noted the patient's tender points and the previous diagnosis of

26 fibromyalgia. However, after evaluating her range of motion, walking ability, and other

27 physical functions, Dr. McPhee concluded that she was capable of medium work.

28

1   These findings conflict with the opinion of one treating physician, Dr. Pretlow,

2   who opined that Ms. Valenzuela was completely disabled.  Of course, the opinion of a

3   treating physician is entitled to great weight and generally receives more weight than the

4   opinion of a doctor who did not treat the claimant.  *See Winans v. Bowen*, 853 F.2d 643,

5   647 (9th Cir. 1987). However, the ALJ may reject a treating physician's opinion if it is

6   controverted by another doctor and there are specific, legitimate reasons for doing so.  *See*

7   *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir. 1995).  In this case, the ALJ has duly

8   provided specific, legitimate reasons that are based on substantial evidence in the record.

9   Dr. Pretlow is the only treating physician who opined that Ms. Valenzuela was

10   disabled.  He expressed his conclusion twice, handwriting it on prescription slips.  On

11   January 21, 2005, he wrote, "In my opinion, [Ms. Valenzuela] is disabled.  She cannot do

12   any and all types of work for 12 months." [TR 237.]  On January 28, 2005, he wrote, "In

13   my opinion, [Ms. Valenzuela] is currently disabled from fibromyalgia and anemia.  She

14   may improve in the future." [TR 238.]  As the ALJ noted, it is not mandatory to accept a

15   treating physician's opinion which is "brief and conclusionary in form with little in the

16   way of clinical findings to support the conclusion."  *Young v. Heckler*, 803 F.2d 963, 968

17   (9th Cir. 1986).  In this case, the conclusory opinions of Dr. Pretlow conflict with the

18   detailed findings and conclusions of the examining physicians.  Neither of his notes

19   included any supporting reasoning or any standard by which to judge Ms. Valenzuela's

20   capacity to work.  Moreover, the meaning of the notes is unclear.  One refers to a twelve-

21   month period without specifying whether that period is prospective or retrospective.  (It

22   appears from the record that Dr. Pretlow had only been treating Ms. Valenzuela for a

23   period of three months at the time he wrote the notes.)  The other note states a potential

24   for improvement in her condition.  These statements of Dr. Pretlow offer little in the way

25   of guidance or expertise, and the ALJ was entitled to disregard them in favor of the more

26   thorough reports from the examining physicians.

27

28

1

**B.     Ms. Valenzuela's Credibility**

2      Beyond the medical evidence, the ALJ also considered Ms. Valenzuela's

3   subjective testimony regarding her pain and impairments.  The ALJ rejected this

4   testimony as not credible.  "In order to find [a claimant's] testimony regarding the

5   severity of his pain and impairments unreliable, the ALJ was required to make 'a

6   credibility determination with findings sufficiently specific to permit the court to

7   conclude that the ALJ did not arbitrarily discredit claimant's testimony.'" *Tommasetti v.*

8   *Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting *Thomas v. Barnhart*, 278 F.3d 947,

9   958 (9th Cir. 2002)).

10      "[Q]uestions of credibility and resolution of conflicts in the testimony are

11   functions solely of the Secretary." *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir.

12   1982).  Although the ALJ is responsible for determining credibility, resolving conflicts in

13   medical testimony, and for resolving ambiguities, *see Andrews v. Shalala*, 53 F.3d 1035,

14   1039 (9th Cir. 1995) (internal quotation marks and citation omitted), the ALJ's credibility

15   findings must be supported by specific, cogent reasons, *see Rashad v. Sullivan*, 903 F.2d

16   1229, 1231 (9th Cir. 1990); *see also Yuckert v. Bowen*, 841 F.2d 303, 307 (9th Cir. 1988).

17   In weighing a claimant's credibility, the ALJ may consider his reputation for truthfulness,

18   inconsistencies either in his testimony or between his testimony and his conduct, his daily

19   activities, his work record, and testimony from physicians and third parties concerning the

20   nature, severity, and effect of the symptoms of which he complains. *See Smolen v.*

21   *Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996) (citations omitted).

22      The ALJ noted several specific factors in support of her determination that Ms.

23   Valenzuela's testimony was not wholly credible.  In particular, three of the medical

24   examinations in the record contained evidence of flawed and exaggerated self-reporting.

25   When Dr. McPhee performed his physical examination, he noted that Ms. Valenzuela's

26   expressions of pain seemed exaggerated relative to the gentle examination performed.

27   [TR 132.]  The other examining physician, Dr. Tromp, noted that she had trouble

28   describing her symptoms and didn't know the meaning of many of her reported

1   conditions. [TR 262.] Dr. Tromp's examination did not suggest significant mental

2   impairment. Though Ms. Valenzuela complained of "fatigue, insomnia, depression,

3   anxiety, stress, memory loss, [and] concentration problems," Dr. Tromp concluded that

4   Ms. Valenzuela was "limited almost entirely by her physical pain" and remained capable

5   of simple and repetitive work.  [TR 265.]

6        In addition to Doctors Tromp and McPhee, one of the treating physicians also

7   suggested that credibility problems were lurking.  After confirming the previous diagnosis

8   of fibromyalgia, Dr. Posner noted that "significant secondary motivation to be regarded as

9   medically disabled may interfere with a productive effort at recovery." [TR 284.] Ms.

10  Valenzuela argues that this statement has no bearing on credibility—that every social

11  security claimant is motivated to be regarded as disabled.  In the court's view, however,

12  there is a sharp difference between a disabled person's incentive to pursue disability

13  benefits and a non-disabled person's motivation to appear disabled.  Dr. Posner made his

14  meaning clear by describing her motivation as "secondary," suggesting that it was not in

15  keeping with a patient's natural primary motivation to facilitate diagnosis and treatment

16  with accurate reporting, receive appropriate benefits, and (hopefully) recover.

17       Finally, the medical reports show only a sporadic focus on treating Ms.

18  Valenzuela's migraine headaches.  They also show that the headaches were treatable with

19  medication.  These reports conflict with Ms. Valenzuela's claims that the migraines are

20  disabling.

21       Considered together, the medical records lend strong support to the ALJ's finding

22  that Ms. Valenzuela's reports of physical and mental impairment are not wholly credible.

23  The ALJ also invokes a number of inconsistencies in Ms. Valenzuela's testimony

24  regarding her changing weight, her ability to manage a household, and family planning

25  efforts.  These inconsistencies are minor, if they exist at all, and do not support the

26  credibility finding.  Nonetheless, there is ample other evidence to support it.  Ms.

27  Valenzuela's subjective reports of significant pain will not, on their own, justify an award

28  of benefits.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### C.   Other Arguments

Ms. Valenzuela raises several additional arguments.  She claims that the ALJ failed to consider a third-party report from her mother, that the ALJ failed to consider mental impairments in making her residual functional capacity assessment, and that the ALJ's conclusion contradicts the testimony of the vocational expert.  Each point is now addressed in turn.

### 1.   Lay Witness Testimony

Contrary to the arguments of counsel, there is no indication that the ALJ "rejected" the lay witness testimony of Ms. Valenzuela's mother, Ms. Otero.  If Ms. Otero's testimony is taken as true, it is consistent with the evidence underlying the denial of benefits.  Thus, no remand is necessary.  *Cf. Vasquez v. Astrue*, 547 F.3d 1101, 1106-07 (9th Cir. 2008) (collecting cases that establish when to remand for further credibility findings).  According to Ms. Otero's report, Ms. Valenzuela experienced pain from fibromyalgia, moved around with difficulty, performed some chores, prepared simple meals, and saw to her own grooming and hygiene with minor difficulty. [TR 97-104.] She could not stand or sit for long periods, but could shop for groceries.  Ms. Otero reported that her daughter was "very limited" in lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, memory, completing tasks, concentration, understanding, and following instructions, but did not elaborate.  This general testimony does not conflict with the more detailed findings of the physicians relating to the degree of Ms. Valenzuela's impairments, especially in light of Ms. Otero's description of her daughter's daily activities.  While the ALJ's opinion does not specifically mention Ms. Otero's report, it does recite that the ALJ considered all the evidence in the record. Therefore, no remand is needed.

### 2.   Mental Limitations

Likewise, the ALJ did not err by failing to include mental limitations in her final residual functional capacity assessment or in her hypothetical posed to the vocational expert.  Rather, she credited the report of Dr. Tromp, the only medical report specifically

- 10 -

1   directed at the claimant's mental capacity. [TR 31.]  Dr. Tromp's report stated that Ms.

2   Valenzuela could handle "simple and repetitive tasks" and that she was "limited almost

3   entirely by her physical pain." [TR 265.] The ALJ specifically included "simple and

4   repetitive" in her questions posed to the vocational expert, who applied those terms to the

5   cashier's position. [TR 323-24.]

6        It is unclear whether Ms. Valenzuela intends to argue that by accepting Dr.

7   Tromp's report, the ALJ was bound to find her disabled.  Dr. Tromp classified the

8   claimant as having moderate limitations relating to her pain.  On cross-examination, the

9   vocational expert admitted that moderately severe limitations would preclude work as a

10  cashier. [TR 334.] At syllogistical first blush, these two statements might suggest

11  disability.  In reality, they do not.  Dr. Tromp's report states that Ms. Valenzuela's pain

12  moderately limited her ability to concentrate, but did not present any significant limitation

13  on her ability to maintain a work schedule. [TR 258.] On cross-examination, counsel for

14  Ms. Valenzuela lawyer defined "moderately severe limitation" to include limited

15  concentration *and* missing 3-4 days of work per week. [TR 333-34.] The ALJ's

16  conclusion is not contrary to Dr. Tromp's report.  It is only contrary to counsel's

17  assumptions during the hearing.

18                      **3.      Sit/Stand Option**

19        There is no merit to the argument that cashier positions do not permit a sit/stand

20  option.  The expert testified that about 20% of the cashier's positions available would

21  have a sit/stand option, and that there were about 4,000 cashier's jobs with a sit/stand

22  option in Arizona. [TR 324-25.] She acknowledged that this statistic does not appear in

23  the dictionary of occupational titles or other published literature, but was based on her

24  own surveys of the local labor market, speaking with about 20–50 employers over the last

25  two years. [TR 332.] The ALJ was entitled to credit this testimony on the basis of the

26  expert's surveys and general familiarity with the job market at large.

27

28

1

### 4.   DOT Categories

2   Finally, Ms. Valenzuela objects to the vocational expert's testimony that she was

3   capable of performing as a cashier, but not as a dietary aid.   She argues that because both

4   of these jobs are classified as "unskilled" in the Dictionary of Occupational Titles

5   ("DOT"), the vocational expert should not have distinguished between them.

6   This argument is not persuasive.  As the expert herself testified, the DOT provides

7   that a dietary aide and a cashier face different challenges in their respective positions.  A

8   cashier performs a set of repetitive tasks that are largely uniform from one customer to the

9   next.  A dietary aide has more sophisticated customer interaction, which involves

10   individualized appraisals of customer needs.  This work involves preparing plates and

11   utensils, serving the meals, preparing coffee and drinks, clearing the area, and knowing

12   what food different people need to avoid.  Ms. Valenzuela cites no authority that prohibits

13   a vocational expert from drawing practical distinctions between individual jobs; such

14   distinctions are particularly suited to the realm of the vocational expert's knowledge.

15   IT IS THEREFORE ORDERED that Plaintiff's Motion for Summary Judgment

16   [doc. # 20] is denied.

17   IT IS FURTHER ORDERED that the Clerk enter judgment in favor of Defendants

18   against Plaintiff and that Plaintiff take nothing.  The Clerk shall terminate this action.

19   DATED this 20th day of January, 2009.

20

21   _____

Neil V. Wake

22   United States District Judge

23

24

25

26

27

28